## Case No. 5,310.

### The GENERAL CHAMBERLAIN.

[1 Hask. 432.] [1]

District Court, D. Maine. Aug., 1872.

SEAMEN'S WAGES—LOSS OF VESSEL—PORT OF DISCHARGE—SHIPPING ARTICLES FOR SPECIFIED TERM—WHEN WAGES DUE.

1. A ship reached her port of destination on arriving at Falmouth with cargo, being there destined for orders, and earned freight so as to entitle the crew to wages.

2. If the ship after sailing thence in obedience to orders is lost before arriving at her port of discharge, the crew are entitled to wages up to the ship's arrival and during one half her stay at Falmouth.

3. A crew shipped for a specified term on a general freighting voyage are entitled to their wages upon the completion in safety of each voyage during the term of their employment, in the absence of agreements to the contrary.

4. No private contract between the ship-owner and shipper in regard to freight can affect the seamen's right to wages.

5. A stipulation in articles, that seamen shall not demand wages until the arrival of the vessel at her final port of destination, does not bar the seamen of their wages in case the vessel is lost before arriving at that port.

In admiralty. Libel in personam against the ship-owners by the crew for wages earned before the ship's loss.

Washington Gilbert, for libellants.
Charles Larrabee, for respondents.

FOX, District Judge. The shipping articles signed by the libellants at New York,

---
[1] [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

describe the voyage as from New York to Callao and Etan and from thence on a general freighting voyage to such ports or places as the master may direct for a term of twenty-four calendar months, ending in the United States. The ship with the libellants as her crew went to Callao and Etan, there discharged her outward cargo and made freight, then returned to Callao, and thence sailed to Guanape where she took on board a cargo of guano under a charter party which required her to proceed "to Falmouth, Eng. for orders to any safe port in Great Britain or the continent between Hamburg and Nantes inclusive." She arrived at Falmouth Nov. 27, 1871, remained there till the 5th of December, and having been ordered to Hamburg, arrived off the mouth of the Elbe Dec. 11; not being able to go up the river on account of ice, she turned back for New Dieppe, and on the night of Dec. 17th was wrecked on the Hague Sands. The pilot and four of her crew perished and everything on board was lost including books and ship's papers. The crew have instituted this libel against the owners, claiming to be paid full wages to the time of the ship's arrival at Falmouth and for half the time she was detained at that port. The respondents offer to pay their wages up to the time their ship's sailing from Guanape, but deny their liability beyond that date, as they claim that no freight was carried on the voyage from Guanape, the ship, as they say, having been lost before completing that voyage and delivering her cargo; and that under the circumstances of this case, Falmouth cannot be deemed a port of destination an arrival at which would entitle the crew to their wages.

The maxim that freight is the mother of wages may be true to this extent, that in all cases where freight is earned and received by the ship-owner, the crew are entitled to their wages for the voyage; but at the present day, the converse of the maxim, that if no freight is earned the crew are not entitled to their wages, does not invariably hold good, as in many instances seamen are entitled to their wages when the ship-owner has no valid claim for freight. If the voyage or freight be lost by the negligence, fraud or misconduct of the owner or master, or voluntarily abandoned by them, if the owner has contracted for freight upon terms or contingencies differing from the general rules of the maritime law, or if he has chartered his ship to receive a freight at a foreign port and none is to be carried on the outward voyage, in all these cases the mariner is entitled to wages, notwithstanding no freight has accrued. Curt. Merch. Seam. 272.

In Pitnam v. Hooper [Case No. 11,186], Judge Story says, "It would be more correct to say the general rule, though not the universal rule, is that the seamen are entitled to wages for the full period of their

employment in the ship's service for any particular voyage in which freight is or might be earned by the owner, * * * and that no private contract between the owner and shipper can affect the right to wages."

The courts were formerly in the habit of dividing the round voyage into an outward and homeward voyage, and if the ship was lost on the homeward voyage of allowing the seamen their wages for the time employed in the outward voyage, and for half the time of the ship's stay at the foreign port; but the question soon arose as to the right of the crew to their wages where the vessel made an intermediate voyage in ballast without carrying any freight, and in such a case the rule, that the carrying of freight was necessary to entitle the seamen to their wages, was so far departed from as to allow the crew their wages for such intermediate voyage, and to determine that the return voyage commenced at the port of departure where her return cargo was received. In the case of The Two Catherines [Id. 14,288], Judge Story sustained this construction of the law, and when a ship sailed from Newport to Gibraltar with a cargo, and went from Gibraltar to Ivica in ballast, and there received on board a return cargo of salt for Providence, and was lost in Narragansett Bay, he allowed the crew their wages up to half the time the ship was detained at Ivica.

If the ship-owner, instead of letting his ship to hire, sees fit to take on board and transport cargo belonging to himself, and the adventure should prove unprofitable, and the owner should not realize its original invoice cost, he would still be liable to the crew for their wages on the voyage, and his liability would in no way be diminished by the unprofitableness of the enterprise.

So if a ship sails on a "seeking voyage," as it is sometimes termed, visiting different ports in search of business and finding none, at length returns to her original port of departure not having earned a dollar for her owners, having gone in ballast to the different ports, the owners are notwithstanding their ill success still liable to the crew for their wages during the whole time they have remained on board, and for the reason that they have performed their part of the contract and safely navigated the ship for the contemplated voyage, and it is wholly immaterial as respects the validity of their claim for wages whether the voyage in its result has or not proved profitable to their employers, the ship-owners.

In the present instance, when this ship sailed from Guanape, her port of destination was Falmouth, and no one on board was certainly aware whether she would discharge her cargo at that port, or would sail from thence to some other port to be determined by the charterers after the ship's arrival at Falmouth without consultation with the master or ship-owner, and in respect to which they had no control or authority. Under this charter party it is quite certain that the voyage might possibly terminate at Falmouth by the charterers there receiving their cargo, as they had a right to require its delivery to them at that port if they saw fit to receive it, and although it is quite unusual to land a large cargo of guano at Falmouth, yet it was not impossible, and circumstances might have arisen in the prosecution of the voyage which would have rendered it advisable for the owners of the cargo to have actually received it at that port, and if it had been thus delivered to them, the seamen would of course have been entitled to their wages.

Many cases are to be found in the reports which hold if the vessel is lost on her return voyage, the seamen are not entitled to their wages for that voyage; and recognizing this as the law of the case, the question arises what was the voyage on which the ship and cargo were lost? Was she lost on a voyage from Guanape, or on one from Falmouth? I am inclined to hold that when the ship sailed from Guanape she was on a voyage to Falmouth, and on her arrival at that port she had completed that voyage, and afterwards in pursuance of the orders given to her at that port, and which she was not to receive before her arrival at that port, she sailed from thence on a new voyage to Hamburg, and was lost in prosecuting her voyage from Falmouth to Hamburg, and not on a voyage from Guanape to Falmouth.

Throughout the voyage from Guanape, what other destination had the ship than Falmouth? None certainly known to any one on board. It was uncertain whether she should proceed beyond Falmouth, and if it is urged that in all reasonable probability she would be ordered thence to another port, her charterers alone could say what port it should be, whether in Great Britain or on the continent between Hamburg and Nantes; and can it with strict accuracy be said that she was destined to either one of such ports before the election had been made and the orders to that effect given by the charterers? Is it not much more accurate and in accordance with the spirit of the modern decisions to consider the voyage from Falmouth as a new voyage, first determined on and having its inception from Falmouth after notice of her arrival at that port, rather than a continuation of the original voyage from Guanape? The voyage on which a ship sails and for which her seamen are to be employed should be fixed and definite at the time of the ship's sailing. The place of destination should be known at that time, and when it is reached, that voyage is complete and ended, and its results should not be liable to be in any way affected by any misfortunes or contingencies of any ulterior voyage to another port afterwards.

If in this case the ship had sailed from Guanape with her crew entitled to be discharged at Falmouth and not bound to go

beyond that port, would they have been deprived of their wages if the ship had subsequently been lost in the North Seas before landing her cargo and earning her freight thereby? If they had been paid off in Falmouth and left the ship, it is quite clear that they could not have been liable to pay back to the owners the wages they had received; and I apprehend the same result would have followed, if instead of having received their wages at Falmouth they had allowed them to remain in the master's hands, and had agreed to remain and navigate the ship from that port to Hamburg; and yet in both instances the ship would have sailed from Guanape bound to Falmouth for orders, and was not entitled to her freight until she had completed her contract by carrying the cargo on to the new port of destination as directed at Falmouth.

This crew shipped for a general freighting voyage of twenty-four months, no places or ports being designated for the prosecution of their duties, and it seems to me that the court is justified in allowing them their wages on every voyage completed by them in safety, whether in ballast or with a cargo on board, and that it should make no difference if there happens to be a cargo which they are required to transport to another port in compliance with the orders received after their arrival at the port first contemplated. If the ship had been in ballast and gone from Guanape to Falmouth and then received orders to proceed on to Hamburg and been lost on the voyage to Hamburg, it is certain that they would have been allowed their wages by Mr. Justice Story, as the case would have been exactly similar to that of The Two Catherines [supra], and I can see no reason why the fact of her having a cargo on board should vary the result.

If the objection is urged to this view that no freight was carried from Guanape, the vessel and cargo having been lost, the answer is that Falmouth is to be deemed the port of original destination, and the ship-owners could have contracted for the payment of a stipulated freight on the safe arrival at that port, and for additional compensation if any was proper according to the risks attending the new voyage to the destination in Great Britain or the continent; and the fact that the charter-party does not provide for such payment on the arrival at Falmouth, but makes the freight dependent on the successful termination of the further voyage, does not exonerate the owners from their liability to the crew for wages, as in accordance with the language of Judge Story, "freight might be earned on such a voyage, and no private contract between the owner and shipper with regard to freight can affect the right to wages."

The stipulation found in the shipping articles, that no seaman shall demand or be entitled to his wages or any part thereof until the arrival of the vessel at her final port of discharge and her cargo delivered, was more than seventy years ago, in the case of Johnson v. Sims [Case No. 7,413], decided not to have the effect of depriving the seaman of his wages in case of non-arrival at her final port of discharge, but as only regulating the time and place of payment, and in case of loss, the seaman on his return could recover the wages to which he was entitled; and this decision has ever since been acted upon and recognized by the courts. The fact that the owners obtained insurance upon the freight can not in any way affect the rights of the crew to their wages; it was a contract to which they were not parties, and it can not enure to their benefit.

I have made a careful examination of all the decisions at my command which in any manner bear upon this question, and whilst I admit that I have met with none directly in point, it is very manifest that the spirit of the modern decisions is favorable to the claims of seamen for their wages; that the harsh restrictions and limitations which for a long time prevailed have been broken down by the courts of admiralty, and at last by acts of parliament and of congress approved June 7, 1872 [17 Stat. 269, § 33], allowing the seaman his wages up to the time of the loss of his ship, in case of proper exertions on his part at the time of loss; and I think I am fully justified in recognizing the manifest equity of their demand. I decree them wages up to the ship's arrival at Falmouth, and for half their stay there.